JUDGE FORREST

**13 CIV 3578**

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN D. HUBER, TRUSTEE OF THE
SAGECREST LIQUIDATING TRUST,

    Plaintiff,

- against -

R. JEFFREY GWIN, JOHN MANNIX and
T. CRAIG HARMON,

    Defendants.

Civil Action No.: 13cv3578 (KBF) ECF cas

**COMPLAINT**



RECEIVED MAY 28 2013 U.S.D.C. S.D.N.Y. CASHIERS

---

Cole, Schotz, Meisel, Forman & Leonard, P.A., attorneys for plaintiff John D. Huber ("Plaintiff" or "Trustee"), in his capacity as trustee of the SageCrest Liquidating Trust (the "Trust") as and for his complaint, alleges as follows:

## PARTIES AND JURISDICTION

1.    The Trust, for which Plaintiff serves as Trustee, was established pursuant to an order of the United States Bankruptcy Court for the District of Connecticut entered on December 13, 2011 (the "Confirmation Order") which confirmed a plan of liquidation (the "Plan") for SageCrest II LLC and certain affiliated entities (collectively, "SC II"). Pursuant to the Plan, the Confirmation Order and the Trust Agreement (collectively the "Plan Documents"), substantially all of the assets of SC II were transferred to the Trust. The Plan Documents also provided that on the Plan's "Effective Date," which was February 12, 2012, all membership interests in SC II were transferred to the Trust and the Trustee became the sole and managing member of SC II. All equity interests in SC II's subsidiaries were likewise transferred to the Trust.

2.    The Trust's principal place of business is 1603 Orrington Avenue, Suite 1600, Evanston, IL.

3. Defendant T. Craig Harmon ("Harmon") is, upon information and belief, a United States citizen, a resident of the Commonwealth of Virginia and a member of the law firm of McGuire Woods LLP. In connection with the allegations and claims for relief set forth in the Complaint, Harmon executed documents pursuant to which he agreed to subject himself to personal jurisdiction in the federal and state courts sitting in New York State.

4. Defendant R. Jeffrey Gwin ("Gwin") is, upon information and belief, a United States citizen and a resident of the State of New York.

5. Defendant John Mannix ("Mannix") is, upon information and belief, a United States citizen and a resident of the State of New York.

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332(a), as a result of the diversity of citizenship of the parties and the fact that the amount in controversy exceeds $75,000.

7. In addition to Harmon's consent to personal jurisdiction in New York under the applicable agreements, this Court has personal jurisdiction over Harmon pursuant to section 302 of New York Civil Practice Law and Rules. As explained in this Complaint, Harmon has acted in concert with Mannix and Gwin and their acts and presence in the jurisdiction are attributable to him.

## BACKGROUND

8. This is a suit by the Trustee for breach of contract, breach of fiduciary duty, unjust enrichment and fraud. The Plaintiff seeks damages of over $13,000,000 against the Defendants, who are jointly and severally liable for the damages. The Trustee also seeks equitable and declaratory relief under 28 U.S.C. §§ 2201 and 2202, and requests that judgment be entered directing the Defendants to remove a lien wrongfully placed on property owned and controlled by the Trust.

9.      The claims for relief set forth in this Complaint arise out of a chain of events which began in late 2006. In August and September of that year, SC II loaned $8,750,000 to a Honduran company called Estrella del Mar ("Estrella") so that it could purchase approximately 125 acres of real property in Roatan, an island in the Gulf of Mexico off the Honduran coast. Upon information and belief, Roatan is a municipality of the sovereign nation of Honduras.

10.     At the time, Estrella was owned by the Defendants through an intermediary shell company known as Black Pearl Resorts III, LLC ("BPC III"). Defendants owned Estrella's shares in equal portions and were its "administrators," the equivalent of its officers. SC II provided all of the funds needed to acquire the above-described property in Roatan, which is known as "Pirates Cove." As a recently formed shell entity, Estrella had minimal or no assets and used funds borrowed from SC II to acquire Pirates Cove and fund all of its operations, such as they were. The Defendants provided no capital for the purchase of Pirates Cove, and in fact the deposits that Estrella had placed on the property were refunded out of the monies borrowed from SC II.

11.     SC II's loans to Estrella matured in December of 2006. Estrella defaulted on the loan repayment and, as a result, SC II and the Defendants agreed that the Defendants would transfer their equity in Estrella to SC II. In return for these shares, SC II transferred a mortgage it held on property owned by another of Defendants' shell companies, Perla Blanca, S.A. ("Perla Blanca"). After this swap was completed, SC II owned the equity in Estrella, and consequently Pirates Cover, subject to SC II's pre-existing mortgages which had a principal balance of $8,750,000.

12.     Although by the end of December 2006 SC II owned Estrella, SC II agreed to leave control of Estrella's assets in the hands of the Defendants. The Defendants remained as

3

Estrella's only officers and, through a separate agreement, they were given broad discretion to develop Pirates Cove and spend more of SC II's money in the process. Simultaneously with the swap, SC II engaged the Defendants under a "Development Agency Agreement" (through yet another one of Defendants' shell companies called Black Pearl Resorts V, LLC ("BP V")) to develop Pirates Cove. In addition to discretionary authority over Estrella and its property, the Defendants were granted a contingent thirty percent (30%) equity share in Estrella. This generous incentive was supplemented by a separate management agreement SC II signed with still one more shell company called "Creative Realty LLC" ("Creative"), pursuant to which Defendants Gwin and Mannix were to receive compensation starting at $130,000 per month, escalating to $200,000 per month.

13. In other words, even though Estrella defaulted on its loans, the individuals then controlling SC II had enough faith in the Defendants to install them as fiduciaries. This faith, however, was misplaced and from the time the Defendants took control of Estrella until the Trustee replaced them as administrators, they engaged in a pattern of self-dealing and deceit which reached its apogee in October of 2008, when, using a pliable Roatan real estate broker they appointed to act on behalf of Estrella, the Defendants granted themselves a mortgage on the Pirates Cove property.

14. In acting as they did, and in using their positions as officers to implement their self-dealing, the Defendants violated fundamental principles governing the conduct of fiduciaries. The Defendants also breached an Indemnity and Guaranty Agreement they provided to SC II, and accordingly are now liable for the full amount due under the promissory notes executed by Estrella.

## FACTS

15. SC II's involvement in Honduran real estate began in late 2005, when Gwin and Mannix persuaded it to provide financing to one of their shell companies, Perla Blanca, so that it could acquire real property in Roatan. Gwin and Mannix had teamed up with Harmon, a real estate lawyer at McGuire Woods LLC, to form Perla Blanca and then convinced Windmill Management LLC ("Windmill"), SC II's then asset manager, to advance funds for the acquisition.

16. This first relatively modest loan was followed in 2006 by the Pirates Cove transaction. With grand ambitions, but no money or relevant experience, the Defendants convinced Windmill to have SC II loan almost $9 million to purchase Pirates Cove, a wild, undeveloped aggregation of properties on the southwestern section of Roatan. Without having ever undertaken such a development before, Defendants persuaded Windmill that a world class hotel chain – Hyatt Resorts was specifically mentioned – was eager to partner with them to build what would be by far the largest and most expensive resort on Roatan.

17. Defendants engaged a local realtor called "All About Roatan" to assist in buying Pirates Cove. Upon information and belief, All About Roatan was owned and controlled by an American expatriate named Marci Jean Wiersma ("Wiersma"). Wiersma received over $300,000 in commissions, all of which came from funds provided by SC II.

18. SC II's loans to Estrella were evidenced by two promissory notes, copies of which are attached as Exhibit A. The notes recited that the amounts owed were secured by a Public Deed of Mortgage. Estrella covenanted and represented in the notes that it would not make any transfer of any interest in its property, direct or indirect, without SC II's written consent. Estrella also covenanted that it would not incur "other indebtedness" or place any other liens on the

property without first obtaining SC II's written consent. Defendant Mannix signed the promissory notes on behalf of Estrella as an "Authorized Signatory."

19. Simultaneously with Estrella's execution of each of the promissory notes, the Defendants delivered a joint Indemnity and Guaranty Agreement (the "<u>Indemnity</u>") to SC II, a copy of one of which is attached hereto as Exhibit B. After reciting that (i) each Defendant owned beneficial interests in Estrella; (ii) the loan was of substantial benefit to them; and (iii) they were agreeing to guarantee Estrella's payment obligations, each Defendant agreed to hold SC II harmless from all damages that SC II suffered resulting from, among other things, any fraud, material misrepresentation or failure to disclose a material fact by Estrella or any of its officers or agents in connection with Estrella's performance under the loan, and any willful misconduct of Estrella occurring while the notes remained unpaid.

20. In section 2 of the Indemnity, the Defendants jointly and severally agreed that they would "be liable for the full amount of [Estrella's] indebtedness in the event that … "[Estrella] fails to obtain [SC II's] prior written consent to any transfer as required by the Note"… or "if [Estrella] defaults … under the other Loan Documents in any way and [Estrella] or any [Defendant] … in any way interferes with, directly or indirectly … with any other enforcement of [SC II's] rights, powers or remedies under any of the Loan Documents or under any document otherwise relating to all or any portion of the Property …"

21. The Indemnity provided that it was a guaranty of payment, not collection, and that the "liability of [each Defendant] … shall be absolute, direct and immediate." The Defendants agreed to waive defenses based upon the statute of limitations, the application of New York law and the jurisdiction of federal and state courts sitting in New York.

22.    Both notes matured on December 1, 2006. They were not paid on their due date and Estrella went into default. Shortly thereafter, on or about December 27, 2006, SC II and Defendants, through their BP III shell entity, entered into an "Exchange Agreement" through which BP III agreed to transfer its shares in Estrella to SC II in return for SC II transferring to BP III a mortgage that it owned on Perla Blanca's property. A copy of the Exchange Agreement is attached hereto as Exhibit C. The execution of the Exchange Agreement did not affect SC II's existing mortgage on Pirates Cove, which remained as a first lien on the property. Even though SC II now owned Estrella, the Defendants retained their positions as "administrators" or officers of the company.

23.    Along with the Exchange Agreement, SC II and Estrella, jointly as the "client," executed a "Development Agency Agreement" with BP V. BP V was represented to be a limited liability company with a principal address at 200 Park Avenue South, New York, New York. Under the Development Agency Agreement, Estrella and SC II granted the Defendants broad discretion to run and develop Pirates Cove, called the "Project." By way of example, BP V was granted "sole management and control over the means, methods, sequences and procedures" with respect to developing Pirates Cove; it had the right to take all action necessary or desirable to negotiate and enter into contracts for the Project and to maintain its books and records. As compensation, BP V was given a thirty percent (30%) contingent equity interest in Estrella, which would vest in stages as and when certain development milestones were met. SC II also agreed to reimburse BP V for purported costs it had incurred in the amount of $744,000.

24.    The development of Pirates Cove was an abject failure. Not one shovel of dirt was turned and today the Pirates Cove property is much the same as it was in 2006, untamed, overgrown raw land. The Defendants failed to secure financing for the Project, failed to execute

an agreement with Hyatt or any other hotel or leisure company and did nothing to materially advance the prospects for a sale of the Property. To the contrary, the Defendants took actions which have impeded the Plaintiff's efforts to sell Pirates Cove.

25. Although Pirates Cove languished and SC II continued paying carrying costs, the Defendants made certain that they were compensated. Besides receiving $744,000 in "reimbursements" through BP V, Defendants submitted questionable expense reports and received hefty monthly fees through Creative. This history of self-dealing reached its zenith in October 2008.

26. On August 20, 2008, SC II filed a petition for reorganization with the United States Bankruptcy Court for the District of Connecticut. Approximately one month later, SC II, at Windmill's direction, moved for the authority to retain Creative to provide professional services to among other things assist in the development of "projects owned or controlled by SageCrest II, such as ... the Pirate's Cove project ...."

27. Within days of this application, and before the Court had approved Creative's retention, the Defendants secretly caused Estrella to grant them a mortgage on all of its assets. The mortgage recited that it was security for a debt allegedly incurred by Estrella almost two years earlier, when the Defendants owned Estrella's shares. ( The mortgage is in Spanish and an English translation is attached hereto as Exhibit D).

28. The issuance and recording of a mortgage on Pirates Cove violated the automatic stay in SC II's chapter 11 case. Section 362(a)(2) of the Bankruptcy Code, 11 U.S.C. § 362(a), enjoins all acts to "exercise control over property" of an estate. By placing a mortgage on property subject to SC II's lien, the Defendants interfered with the ability of SC II to exercise its rights as a mortgagee and thereby its control over the asset.

29. This scheme to encumber SC II's property began at least four months earlier. Knowing that SC II was having significant financial issues, the Defendants, using their positions as officers of Estrella, granted their friend, confidant and real estate broker, Wiersma, a power of attorney to act on behalf of Estrella. Once Wiersma's power of attorney was filed, on or about October 8, 2008, the Defendants directed Wiersma to use her new authority to have Estrella execute a mortgage in their favor. These actions were not disclosed to the Bankruptcy Court, to SC II's creditors or investors or to the board of directors of SageCrest Holdings Limited, a companion fund to SC II –also in reorganization proceedings -- and an entity with a substantial stake in Estrella. Upon information and belief, this mortgage was not disclosed to SC II or Windmill.

30. The mortgage set interest at 18%, default interest at 27%, and a maturity date of October 30, 2008, just twenty-two days from the date it was signed by Wiersma. Payment was to be made by registered mail to Merchant Equity Group, 200 Park Avenue South, Suite 1618, New York, New York, yet another of Defendants' shell companies.

31. The purported mortgage contained covenants inconsistent with the rights of SCII under its mortgage and notes including, for example, a restriction on Estrella selling, alienating or encumbering the Pirates Cove properties except with the Defendants' express written consent, and a requirement that Estrella provide the Defendants with receipts for paid real estate taxes. Wiersma also agreed to "expressly waive the proceedings of the executive judgment prior to establishing a hearing for the auctioning" of Estrella's assets; and she agreed that Estrella would waive service of process in any mortgage foreclosure action.

32. The obligation that the unauthorized and secret mortgage was intended to secure apparently related to a "Fixed Rate Note" dated November 20, 2006, which was never provided

49856/0001-9506388v2

to SC II and was first obtained by the Trustee in 2012. There is no other document to support the contention that Estrella's shareholders' investment in their company should be treated as a loan rather than equity. There is no loan agreement or corporate resolution documenting the loan, nor is there a written consent of SC II to the loan, which was required because this loan was allegedly made after Estrella had received almost $9 million from SC II. There is, moreover, no proof that this document was actually signed on November 20, 2006. The Fixed Rate Note is an unsecured obligation and does not contain a commitment by Estrella to grant a mortgage to its shareholders.

## FOR A FIRST CLAIM FOR RELIEF

33. Plaintiff repeats and realleges paragraphs 1 through 32 of this Complaint as if fully set forth herein.

34. The Indemnity is a valid, enforceable contract between SC II and the Defendants.

35. SC II performed its obligations under the Indemnity by loaning approximately $9 million to Estrella.

36. Defendants have breached the Indemnity, by among other actions, causing Estrella to transfer interests in its property by granting a mortgage.

37. As a result of Defendants' actions, they have triggered their payment obligations under the Indemnity.

38. SC II, and consequently the Trust, have been damaged as a direct and proximate result of the Defendants' action.

39. By reason of the foregoing, including but not limited to causing Estrella to have transferred an interest in its property by, among other things, placing a mortgage thereon, the Defendants have breached the Indemnity and are now jointly and severally liable for all

10
49856/0001-9506388v2

principal, accrued interest and costs arising under the promissory notes, which currently exceeds $13 million.

## FOR A SECOND CLAIM FOR RELIEF

40. Plaintiff repeats and realleges paragraph 1 through 39 of this Complaint as if fully set forth herein.

41. As Estrella's officers, the Defendants were fiduciaries subject to a duty of loyalty and duty of due care.

42. Defendants have breached their duties of loyalty and due care, by among other things, secretly appointing Wiersma to act as Estrella's agent and providing her a power of attorney to act on behalf of Estrella so that she could execute a mortgage in favor of the Defendants.

43. SC II, and consequently the Trust, have sustained damages as a direct and proximate result of the Defendants' breach of their duties of loyalty and due care.

44. As a result of the breaches of fiduciary duty, the Defendants have damaged Plaintiff in an amount to be determined at trial, but no less than $13 million.

## FOR A THIRD CLAIM FOR RELIEF

45. Plaintiff repeats and realleges paragraph 1 through 44 of this Complaint as if fully set forth herein.

46. As Estrella's officers, the Defendants were fiduciaries subject to a duty of loyalty and duty of due care.

47. Defendants have breached their duties of loyalty and due care, by among other things, causing Estrella, by its agent Wiersma, to wrongfully grant a mortgage in favor of the Defendants.

49856/0001-9506388v2

48. SC II, and consequently the Trust, have sustained damages as a direct and proximate result of the Defendants' breach of their duties of loyalty and due care in an amount to be determined at trial but no less than $13 million.

### FOR A FOURTH CLAIM FOR RELIEF

49. Plaintiff repeats and realleges paragraph 1 through 48 of this Complaint as if fully set forth herein.

50. Defendants secretly granted themselves a mortgage on Estrella's property without giving the required notice to SC II.

51. The Defendants concealed their actions from SC II, its creditors and investors, as well as the Bankruptcy Court, in violation of their duty to disclose.

52. Upon information and belief, Defendants granted the mortgage to themselves on Estrella's property with the intent to defraud SC II.

53. In secretly granting themselves a mortgage on Estrella's property, the Defendants defrauded Estrella, SC II and the Plaintiff as its successor.

54. As a direct and proximate result of Defendants' fraudulent actions, SC II, and consequently the Trust, have sustained damages.

55. By reason of the foregoing, the Defendants have damaged Plaintiff in an amount to be determined at trial, but no less than $13 million.

### FOR A FIFTH CLAIM FOR RELIEF

56. Plaintiff repeats and realleges paragraph 1 through 55 of this Complaint as if fully set forth herein.

57. SC II lent funds to Estrella with the expectation of either being paid in full or being able to foreclose on Pirates Cove in accordance with the mortgage.

49856/0001-9506388v2

58. SC II has not been repaid the funds it lent to Estrella as a direct result of the Defendants' improper actions.

59. SC II has been unable to foreclose on Pirates Cove as a result of the Defendants' improper actions.

60. SC II, and consequently the Trust, have been damaged as a result of the Defendants' improper actions.

61. By reason of the foregoing, the Defendants have been unjustly enriched at the expense of SC II and the Trust in an amount to be determined at trial, but no less than $13 million..

## FOR A SIXTH CLAIM FOR RELIEF

62. Plaintiff repeats and realleges paragraph 1 through 61 of this Complaint as if fully set forth herein.

63. The Trust, as the sole member of SC II and therefore the owner of Estrella, is the rightful owner of Pirates Cove.

64. The only validly placed mortgage on Pirates Cove is the mortgage in favor of SC II.

65. Defendants have converted the Trust's property by placing an unauthorized lien thereon.

66. By placing a mortgage on the Trust's property without the authority to do so, Defendants have converted the property for which they are liable in damages in an amount to be determined at trial, but no less than $13 million.

## FOR A SEVENTH CLAIM FOR RELIEF

67. Plaintiff repeats and realleges paragraph 1 through 66 of this Complaint as if fully set forth herein.

49856/0001-9506388v2

68. By reason of the foregoing, pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff is entitled to a declaration that the Defendants' mortgage is void on the grounds, inter alia, that it was procured by fraud, it was unauthorized and it violated the automatic stay under 11 U.S.C. § 302(a)(3) applicable to SC II's bankruptcy case.

69. Pursuant to 28 U.S.C. § 2202, Plaintiff requests further necessary and proper relief against Defendants ordering them to take all steps required to void or remove the mortgage as a matter of record under Honduran law.

WHEREFORE, Plaintiff prays for judgment as follows:

(a) On all claims for relief, damages in an amount to be determined at trial, but no less than $13 million.

(b) Judgment declaring that the mortgage on Estrella's property is invalid and void and that they be ordered to take all steps required to remove the mortgage as a matter of record under Honduran law

Dated: New York, New York
May 28, 2013

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.,
A Professional Corporation
*Attorneys for John D. Huber, Liquidating Trustee of the SageCrest Liquidating Trust*

By: /s/ Laurence May
Laurence May, Esq.
Nolan Shanahan, Esq.
900 Third Avenue, 16th Floor
New York, NY 10022
(212) 752-8000